UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL PEREZ and MACARIO PEREZ,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALL AG, INC., *a California corporation*; *et al.*,<br><br>    Defendants. | No. 1:18-cv-00927-DAD-EPG<br><br>ORDER DENYING PRELIMINARY APPROVAL OF SETTLEMENT<br><br>(Doc. No. 40) |

**INTRODUCTION**

This matter came before the court on September 4, 2019 for hearing on a motion for preliminary approval of the proposed settlement (the "Settlement") brought on behalf of plaintiffs Manuel Perez and Macario Perez (collectively, the "plaintiffs"). (Doc. No. 40; *see also* Doc. Nos. 42, 43.) Attorneys Anali Cortez and Estella Cisneros appeared on behalf of plaintiffs, and attorneys Dawn Berry and Justin Campagne appeared telephonically on behalf of defendants. For the reasons set forth below, the court must deny preliminary approval of the Settlement.

**BACKGROUND**

Defendants Means Nursery, Inc. ("Means Nursery") and Gold Coast Farms, LLC ("Gold Coast") cultivate and prepare horticultural products for distribution to third-party retailers. (Doc.

1

No. 22, Second Am. Comp. ("SAC") at ¶¶ 29–30.)  Both companies hired defendant All Ag, Inc. ("All Ag") (collectively, the "defendants") to supply workers and process payroll at Gold Coast's Woodlake, California nursery in Tulare County.  (*Id.* at ¶¶ 8, 28–29.)

Both plaintiffs worked for defendants at the Woodlake nursery growing ornamental plants.  (*Id.* at ¶¶ 8–9.)  Manuel Perez worked for defendants from approximately May 2013 through November 21, 2017, and Macario Perez, from approximately April 2001 through December 4, 2017.  (*Id.*)

On July 9, 2018, plaintiffs filed this PAGA representative action.  (Doc. No. 1, Compl.)  In their Second Amended Complaint, filed November 13, 2018, plaintiffs allege ten causes of action under California's Labor Code, Business and Professions Code, Unfair Competition Law, and the Private Attorney General Act ("PAGA"), as well as the federal Fair Labor Standards Act ("FLSA").  (SAC at ¶¶ 47–92.)  Defendants, however, deny and dispute all of plaintiffs' claims.  (*See* Doc. Nos. 13, 14, 40 at 3.)  On April 30, 2019, after several months of formal discovery and investigation, the parties participated in a full-day settlement conference before U.S. Magistrate Judge Jeremy D. Peterson, during which they agreed to settle the case.  (*See* Doc. No. 31.)  A second settlement conference before Judge Peterson on July 8, 2019 resolved the outstanding issues.  (*See* Doc. No. 39.)  Thereafter, plaintiffs moved for preliminary approval of the Settlement on July 27, 2019.  (Doc. No. 40.)

After the September 4, 2019 hearing on the pending motion, the court requested that the parties submit additional authorities supporting approval of a PAGA settlement pursuant to which the California Labor & Workforce Development Agency ("LWDA") receives little to none of the PAGA settlement fund.  (Doc. No. 45.)  Plaintiffs responded on September 5, 2019 with a list of cases and an August 24, 2017 letter from the LWDA to U.S. District Judge Lucy H. Koh of the Northern District of California setting forth the circumstances under which the LWDA would not seek civil penalties won pursuant to PAGA.  (Doc. No. 46-1.)  *See Ramirez v. Benito Valley Farms, LLC*, No. 1:16-cv-04708-LHK (N.D. Cal. Apr. 9, 2020) (Doc. No. 60).  Shortly thereafter, defendants notified the court on September 13, 2019 that the California Supreme Court had rendered a decision on September 12, 2019 in *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175 (2019)

that was potentially adverse to the Settlement. (Doc. No. 47.) Before addressing these issues, the court summarizes the Settlement below.

## THE PROPOSED SETTLEMENT

The Settlement pending before the court for preliminary approval attempts to resolve plaintiffs' representative PAGA claims and the individual claims of the two named plaintiffs, including their FLSA claims. (Doc. No. 40 at 4, 14.) Curiously, the Settlement is not structured as a class action settlement, but nonetheless attempts to recover unpaid wages on behalf of a group of 189 individuals currently or formerly employed by defendants via a PAGA claim. (*Id.* at 6–7; Doc. No. 40-1 at 5, 10.)

**A.     The Relevant Period for Plaintiffs' PAGA Claims**

According to the Settlement Agreement, the relevant period for plaintiffs' PAGA claims (the "Relevant Period") is from July 9, 2017 to June 8, 2019. (Doc. No. 40-1 at 10 (defining "PAGA Claims" as "claims for PAGA penalties . . . from July 9, 2017 to June 8, 2019.") This date range is also listed in the Notice Form provided by plaintiffs. (*Id.* at 27.) However, plaintiffs assert in their Memorandum of Points and Authorities that the unpaid wages and penalties recovered pursuant to PAGA will be distributed on a *pro rata* basis calculated using the number of workweeks employees worked for defendants from February 15, 2015 to June 8, 2019, a range beginning more than two years earlier than the range covered by the PAGA claim. (Doc. No. 40 at 6–7.) This latter, longer date range is also referenced in attorney Anali Cortez's declaration in support of the pending motion for preliminary approval. (Doc. No. 40-1, Cortez Decl. at 5.) Due to this inconsistency, the court cannot pinpoint the Relevant Period with respect to plaintiffs' PAGA claims.

**B.     The PAGA Settlement Group**

The Settlement Agreement defines "PAGA Settlement Group Members" as:

> Plaintiffs and all current and former employees employed by Gold Coast Farms, LLC, Means Nursery, Inc. and All Ag, Inc. in a nonexempt position at the Woodlake Location from February 15, 2015 to June 8, 2019. The Parties represent that there are approximately 189 individuals who qualify as PAGA Settlement Group Members.

3

(Doc. No. 40-1 at 11.) Although the Relevant Period in this definition matches the one referenced in plaintiffs' Memorandum of Points and Authorities and attorney Cortez's declaration, (*see* Doc. No. 40 at 6–7; Cortez Decl. at 5), it is inconsistent with the Settlement Agreement's own definition of the "PAGA Claims" and the date range of those claims (*See* Doc. No. 40-1 at 10 (defining "PAGA Claims" as "claims for PAGA penalties . . . from July 9, 2017 to June 8, 2019.").) Here again the court cannot determine what constitutes the PAGA Settlement Group because of this inconsistency.

**C.      The Monetary Terms of the Settlement**

Under the Settlement, defendants are to pay a total of $150,000.00 (the "Gross Settlement Fund") to resolve all claims alleged in the lawsuit, including penalties and attorneys' fees and costs. (Doc. Nos. 40 at 6; 40-1 at 13–14.) The Gross Settlement Fund is allocated as follows: 1) $25,035.00 to settle plaintiffs' individual claims, with $11,505.00 to Manuel Perez and $13,530.00 to Macario Perez; 2) $45,465.00 in PAGA penalties and unpaid wages for the PAGA Settlement Group (the "PAGA Settlement Fund"); and 3) $79,500.00 for plaintiffs' attorneys' fees and costs. (*Id.*) The parties also agree to jointly pay the Settlement Claims Administrator, with plaintiffs paying no more than $5,000.00 of the cost. (*Id.*)

The PAGA Settlement Fund is itself divided into the Underpaid Wages Fund, worth $43,465.00, and the Penalties Fund, worth $2,000.00. (Doc. No. 40 at 6–7.) While the Underpaid Wages Fund is allocated entirely to the 189 PAGA Settlement Group Members, 75% of the Penalties Fund, or $1,500.00, will be paid to the LWDA, with 25%, or $500.00, left for the PAGA Settlement Group Members. (*Id.*) All of the funds allocated to the PAGA Settlement Group Members are to be paid out on a *pro rata* basis, based on the number of workweeks each member worked for defendants, with each workweek valued at a maximum of $71.99. (*Id.* at 7.) To receive their payments, PAGA Settlement Group Members must return a Claim Form; funds not claimed will be paid to the LWDA, as no portion of the Settlement Fund is to revert to defendants. (*Id.* at 8.)

/////

/////

**D.      The Non-Monetary Terms of the Settlement**

In addition to the monetary relief, defendant All Ag agrees to pay all employees at the Woodlake, California nursery overtime after eight (8) hours in a workday and/or forty (40) hours in a workweek (the "Revised Overtime Policy"), beginning thirty (30) days after approval of the Settlement, and to notify all new and existing employees of the policy in writing, in both English and Spanish. (Doc. Nos. 40 at 8; 40-1 at 16.) All Ag also commits to certifying its compliance with the Revised Overtime Policy each year on January 1, until January 1, 2022. (Doc. No. 40 at 8.)

Plaintiffs and their counsel, on the other hand, agree to not disclose the identity of defendants or their owners, officers, directors, agents, or trustees, and to limit their description of defendants in any publicity to a "large nursery and a farm labor contractor in the San Joaquin Valley." (*Id.* at 8–9.)

**LEGAL STANDARDS**

**A.      PAGA Settlements**

Under PAGA, an "aggrieved employee" may bring an action for civil penalties for Labor Code violations on behalf of herself and other current or former employees. Cal. Lab. Code § 2699(a).[1] A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). Accordingly, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.*; *see also Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 381 (2014) ("When a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as though the person were a party.").

/////

---

[1] An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

The PAGA statute imposes a number of limits on litigants. First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims. *See Iskanian*, 59 Cal. 4th at 381; *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175 (2019). Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the employer. Cal. Lab. Code § 2699.3(a)(1). Third, any civil penalties recovered must be divided 75% with the LWDA and 25% with the aggrieved employees. *Id.* at § 2699(i).

Finally, a trial court must "review and approve" any settlement of PAGA claims.[2] *Id.* at § 2699(l)(2). There is no binding authority identifying the proper standard of review of PAGA settlements to be employed by the court. In the class action context, where PAGA claims often appear, a district court must also independently determine that a proposed settlement agreement is "fundamentally fair, adequate and reasonable" before granting approval. *See In re Heritage Bond Litig.*, 546 F.3d 667, 674–75 (9th Cir. 2008). However, the Settlement here is not structured as a class action, and PAGA claims are intended to serve a decidedly different purpose—namely to protect the public rather than for the benefit of private parties. *See Arias*, 46 Cal. 4th at 986. In one case, the LWDA provided some guidance regarding court approval of PAGA settlements. There, where both class action and PAGA claims were covered by a proposed settlement, the LWDA stressed that

> when a PAGA claim is settled, the relief provided for under the PAGA [must] be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court [must] evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

California Labor and Workforce Development Agency's Comments on Proposed PAGA

---

[2] The proposed settlement must also be simultaneously submitted to the LWDA. Cal. Lab. Code § 2699(l)(2). Plaintiffs affirm that they did so when they filed the pending motion with this court. (Doc. No. 40 at 12.)

Settlement ("LWDA Letter"), *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. No. 736 at 2–3);[3] *see O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA Letter with approval).

Recognizing the distinct issues presented by class actions, this court is nevertheless persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA-only settlement agreement now before the court. *See, e.g.*, *Tenorio v. Gallardo*, No. 1:1-cv-00283-DAD-JLT, 2019 WL 4747949, at *3 (E.D. Cal. Sept. 30, 2019); *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019). Pursuant to those decisions, the approval of a settlement of PAGA claims is appropriate upon a showing that the settlement terms 1) meet the statutory requirements set forth by PAGA, and 2) are fundamentally fair, reasonable, and adequate[4] in view of PAGA's public policy goals.

**B.    FLSA Settlements**

Under the FLSA, an employee may file a civil action against an employer who abridges the FLSA's guarantees. 29 U.S.C. § 216(b); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013) ("The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."). Employees may bring collective actions under the FLSA, representing all "similarly situated" employees, but "each employee [must] opt-in to the suit by filing a consent to sue with the district court." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000). Because an employee cannot waive claims under the FLSA, the claims may not be settled without court approval or Department of Labor supervision. *Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO,

---

[3] In the LWDA Letter, the LWDA also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action."

[4] The court's determination as to fairness, reasonableness, and adequacy may involve a balancing of several factors including but not limited to the following: the strength of plaintiffs' claims; the risk, expense, complexity, and likely duration of further litigation; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; and the experience and views of counsel. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

2018 WL 1305713, at *1 (E.D. Cal. Mar. 13, 2018) (citing *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981)). The decision to certify an FLSA collective action is within the discretion of the district court. *See Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).

Although the Ninth Circuit has not established criteria to evaluate FLSA settlements, district courts in this circuit routinely apply the Eleventh Circuit standard, which examines whether a settlement is a fair and reasonable resolution of a bona fide dispute. *See, e.g.*, *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982)); *Nen Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014) (same). "A bona fide dispute exists when there are legitimate questions about the existence and extent of defendant's FLSA liability." *Kerzich v. Cty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018) (citation omitted). A court will not approve a settlement when there is certainty that the FLSA entitles plaintiffs to the compensation they seek because doing so would shield employers from the full cost of complying with the statute. *Id.*

If a bona fide dispute exists, "[c]ourts often apply the Rule 23 factors in evaluating the fairness of an FLSA settlement, while recognizing that some do not apply because of the inherent differences between class actions and FLSA actions." *Khanna v. Inter-Con Sec. Sys., Inc.*, No. 2:09-cv-02214-KJM-EFB, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22, 2013) (internal quotation marks and citations omitted). The factors include

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Khanna v. Intercon Sec. Sys., Inc.*, No. 2:09-cv-2214-KJM-EFB, 2014 WL 1379861, at *6 (E.D. Cal. Apr. 8, 2014), *order corrected*, 2015 WL 925707 (E.D. Cal. Mar. 3, 2015) (quoting *Hanlon*

*/////*

8

*v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

District courts in this circuit have also taken note of the "unique importance of the substantive labor rights involved" in settling FLSA actions and adopted a "totality of circumstances approach that emphasizes the context of the case." *Selk*, 159 F. Supp. 3d at 1173. With this approach, a "district court must ultimately be satisfied that the settlement's overall effect is to vindicate, rather than frustrate, the purposes of the FLSA." *Id.* In connection with this, the district court's "obligation is not to act as caretaker but as gatekeeper, so that FLSA settlements do not undermine the Act's purposes." *Kerzich*, 335 F. Supp. 3d at 1185 (citation omitted). Thus, only settlements of FLSA actions that reflect a fair and reasonable compromise of issues actually in dispute may be approved. *Id.* (citation omitted).

## LEGAL ANALYSIS

A settlement must be "taken as a whole, rather than the individual component parts" and thus "must stand or fall in its entirety." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). If there are obvious deficiencies, the settlement cannot be approved. *See Gonzalez v. CoreCivic of Tennessee, LLC,* No. 1:16-cv-01891-DAD-JLT, 2018 WL 4388425, at *2 (E.D. Cal. Sept. 13, 2018) (citing *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)). Here, there are a host of issues that must addressed before the court can consider approving the proposed Settlement.

**A.     The Settlement Suffers from Obvious Deficiencies and Cannot Now Be Approved**

1.     Settlement Definitions

First, there are several discrepancies between the way certain terms are defined in the Settlement Agreement as opposed to the manner they are described in the briefing in support of preliminary approval. For example, and as noted above, the Settlement Agreement and the Notice Form both state that the Relevant Period for the PAGA claims being settled ranges from July 9, 2017 to June 8, 2019. (Doc. No. 40-1 at 10, 27.) However, plaintiffs' memorandum of points and authorities and the declaration of plaintiffs' attorney Anali Cortez state that the

/////

relevant period runs from February 15, 2015 through June 8, 2019.  (Doc. No. 40 at 6–7; Cortez Decl. at 5.)

Although the court might have been able to resolve this ambiguity by approving the definition expressly contained in the Settlement Agreement, that agreement itself has an internal contradiction.  It defines "PAGA Settlement Group Members" as "all current and former employees employed by [defendants] in a nonexempt position at the Woodlake Location from February 15, 2015 to June 8, 2019," but "PAGA Claims" as "claims for PAGA penalties . . . from July 9, 2017 to June 8, 2019."  (*Compare* Doc. No. 40-1 at 11, *with id.* at 10.)  These inconsistencies must be corrected before the court can consider approving the Settlement.

2. Monetary Terms

a. *The PAGA Settlement Fund*

As the court noted at the hearing on the pending motion, it has concerns regarding the parties' transparent attempt to make an end run around PAGA, which specifically provides that 75% of civil penalties recovered under PAGA are to go to the LWDA, with 25% reserved for the aggrieved employees.  *See* Cal. Lab. Code § 2699(i).  Here, the parties have structured the PAGA Settlement Fund so that most of the funds are designated as an "Unpaid Wages Fund," with only a small fraction dedicated to the "Penalties Fund."  (*See* Doc. No. 40 at 6–7.)  All of the Unpaid Wages Fund is to be awarded to aggrieved employees, and only the Penalties Fund will be subject to § 2699(i)'s penalties distribution provision.  (*Id.*)  This means that nearly 97% of the PAGA Settlement Fund will go to the allegedly aggrieved employees, and only 3% will be left for the LWDA.  In response to the court's request for additional briefing on this issue, plaintiffs have offered several examples of cases where courts purportedly approved PAGA settlements with a "zero allocation or minimal percentage of the PAGA settlement portion going to the [LWDA]."[5]  (Doc. Nos. 45; 46 at 1.)

---

[5] The court notes that at least one of the authorities provided by plaintiffs does not actually fit the bill.  In *Juarez v. Villafan*, No. 1:l6-cv-00688-DAD-SAB (E.D. Cal. Aug. 24, 2017), this court noted that the settlement "includes payment of $0.00 for claims brought under the FLSA and PAGA" because "plaintiffs are not recovering any amounts for claims brought under PAGA."  *Id.*, (Doc. No. 36 at 2, 4.).

10

In addition, shortly after the hearing on the pending motion, the California Supreme Court issued its decision in *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175 (2019), holding that "unpaid wages are not recoverable as civil penalties under the PAGA." *Id.* at 193 (construing "unpaid wages as compensatory relief that an employee may not recover in a PAGA claim"). The court reasoned that "[t]his is because the PAGA authorizes a representative action only for the purpose of seeking civil penalties for Labor Code violations, and an action to recover civil penalties is fundamentally a law enforcement action, not one for the benefit of private parties." *Id.* at 196–97; *see also Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 435 (9th Cir. 2015). Thus, only the state Labor Commissioner can recover unpaid wages via § 558. *ZB, N.A.*, 8 Cal. 5th at 193, 195. Accordingly, the court concludes that the structure and allocation of the PAGA Settlement Fund here contravenes the statutory limits set forth in the PAGA as interpreted by the California Supreme Court.

In order to proceed, the parties must resolve the issue of "unpaid wages under an appropriate cause of action" and in a manner consistent with the PAGA's strictures.[6] *Gonzales v. Emeritus Corp.*, 407 F. Supp. 3d 862, 864 (N.D. Cal. 2019) (citing *ZB, N.A.*, 8 Cal. 5th at 198); *see, e.g.*, *Benitez v. W. Milling, LLC*, No. 1:18-cv-01484-SKO, 2020 WL 309200, at *9 (E.D. Cal. Jan. 21, 2020); *Olivo v. Fresh Harvest, Inc.*, No. 17-cv-02153-L-WVG, 2019 WL 6329227, at *5 (S.D. Cal. Nov. 25, 2019). Whether the parties do so by pursuing class certification for the purposes of settlement pursuant to an appropriate cause of action, by settling individually with each PAGA Settlement Group Member and convincing the undersigned that this is reasonable (*see Olivo*, 2019 WL 6329227, at *5), or by any other appropriate method, is up to the parties.

      b.  *Settlement of FLSA Claims*

The Settlement also resolves plaintiffs' individual FLSA claims. However, the pending motion fails to provide the court with sufficient information to determine if the settlement of the FLSA claims is a fair and reasonable resolution of a bona fide dispute. This means, among other

---

[6] The parties must also either amend the Settlement to remove the requirement that PAGA Settlement Group Members submit a claim form to receive their unpaid wages or justify to this court's satisfaction why this requirement is necessary.

11

things, that the parties must demonstrate to the court that "a bona fide dispute exists" regarding "the existence and extent of defendant's FLSA liability." *Kerzich*, 335 F. Supp. 3d at 1184. A court will not approve a settlement when there is certainty that the FLSA entitles plaintiffs to the compensation they seek because doing so would shield employers from the full cost of complying with the statute. *Id.*; *see also Selk.*, 159 F. Supp. 3d at 1172. Here, however, defendants have only recited boilerplate denials of liability. (Doc. Nos. 13; 14; 40 at 3; 40-1 at 17.) This is insufficient to establish a bona fide dispute—the parties must demonstrate a real factual and/or legal dispute about defendant's liability before the court can approve the settlement of plaintiff's FLSA claims. *See Kerzich*, 335 F. Supp. 3d at 1184 ("A bona fide dispute exists when there are *legitimate questions* about the existence and extent of defendant's FLSA liability.") (emphasis added).

                c. *Employer Payroll Taxes*

The court also has serious concerns about the allocation of employer payroll taxes under the Settlement. The parties assert that "Defendants have agreed to pay a total of $150,000.00 to resolve all claims alleged in the lawsuit as well as penalties, attorneys' fees and costs. *Additionally*, Defendants will pay all employer payroll taxes owed." (Doc. No. 40 at 6) (emphasis added). This suggests to the court that *defendants* are liable for the employer portion of any payroll taxes. Yet, the Settlement Agreement states that the "Settlement Amount" of $150,000.00 *includes* "employer payroll taxes on any wage portions of the settlement," effectively shifting that burden to employees. (Doc. No. 40-1 at 11.) Plaintiffs' Memorandum of Points and Authorities thus appears to misrepresent the party that will actually be responsible for paying the employer payroll taxes. If this is the case, it would be doubly deceptive because, as the name suggests, employer payroll taxes are supposed to be paid by the *employer* and are not deducted from an employee's gross pay.[7] Here, however, it appears that the employer payroll

---

[7] Employee payroll taxes are typically deducted from an employee's paycheck, lowering an employee's net pay. Employer payroll taxes, however, are paid directly by the employer and are not deducted from an employee's paycheck. *See* Employment Taxes and Classifying Workers, INTERNAL REVENUE SERVICE (Dec. 2007), https://www.irs.gov/pub/irs-news/fs-07-27.pdf (explaining that employers are responsible for their half of federal employer payroll taxes and that "[e]mployees do not pay this tax or have it withheld from their pay"); *see also* Matt Mansfield,

taxes will be paid from the fund set aside for unpaid wages, depriving employees of the unpaid wages that they are due. The court cannot approve this provision as interpreted here.

          d.  *Attorneys' Fees*

Courts "have an independent obligation to ensure that the award [of attorneys' fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011); *see also Consumer Privacy Cases*, 175 Cal. App. 4th 545, 555 (2009) ("The court has a duty, independent of any objection, to assure that the amount and mode of payment of attorneys' fees are fair and proper, and may not simply act as a rubber stamp for the parties' agreement.").

Where, as here, fees are to be paid from a common fund, the relationship between the beneficiaries and counsel "turns adversarial." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted). As a result, the district court must assume a fiduciary role and "act with 'a jealous regard to the rights of those who are interested in the fund' in determining what a proper fee award is." *Id.* (internal quotation marks and citations omitted). Although the court notes that the Settlement here does not include a certified class under Federal Rule of Civil Procedure 23, the interests of the 189 PAGA Settlement Group Members and of the state are nonetheless implicated, so the court can identify no reason to abandon its scrutiny of the award of attorneys' fees in this case. *See* Cal. Lab. Code § 2699(g)(1) ("Any employee who prevails in any action shall be entitled to an award of *reasonable* attorney's fees[.]") (emphasis added).

In evaluating the award of attorneys' fees, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations omitted); *see also Lealao v. Beneficial Cal., Inc.*, 82 Cal. App. 4th 19, 27, 53 (2000) (noting the

---

*What are Employee and Employer Payroll Taxes*, GUSTO (November 1, 2019), https://gusto.com/blog/payroll/payroll-taxes ("Payroll taxes paid by the employer, however, do not affect an employee's paycheck"); Diana Van Blaricom, *Payroll Taxes and Employer Responsibilities*, THE BALANCE SMALL BUSINESS (Sept. 27, 2019), https://www.thebalancesmb.com/payroll-taxes-3193126 ("Companies are responsible for paying their portion of payroll taxes as well. These payroll taxes are an added expense over and above the expense of an employee's gross pay.").

same for state law claims in cases involving a common fund). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002); *see also Consumer Privacy Cases*, 175 Cal. App. 4th at 557–58 (same).

Under the percentage of the fund method, the court may award class counsel a percentage of the common fund recovered for the class; in the Ninth Circuit, the benchmark for such an award is 25%. *Fischel*, 307 F.3d at 1007, 1047–48; *see also Bluetooth*, 654 F.3d at 942. Special circumstances that could justify varying the benchmark award include when counsel achieves exceptional results for the class, undertakes extremely risky litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015). An explanation, however, is necessary when the court departs from the 25% benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000). Either way, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). With the lodestar method, the court multiples the number of hours the prevailing party reasonably spent litigating the case by a reasonable hourly rate for counsel. *Bluetooth*, 654 F.3d at 941. The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the amount by employing the other as well. *See Bluetooth*, 654 F.3d at 944. This diligence is particularly important "when counting *all* hours expended" in a case "where the plaintiff has achieved only limited success" would yield an "excessive amount" of fees, or when awarding a percentage of a "megafund would yield windfall profits for class counsel in light of the hours spent on the case." *Id.* at 942 ("Just as the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate,

/////

14

the percentage-of-recovery method can likewise be used to assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations omitted). Similarly, an upward adjustment could be justified if the recovery is "too small . . . in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Here, plaintiffs' counsel seeks an award of $79,500.00 in attorneys' fees and costs. (Doc. No. 40 at 6.) According to the supporting documentation they provided to the court, they have already expended 614.7 billable hours prosecuting this case, worth $159,400.00 in fees, and incurred $2,213.48 in recoverable costs. (Doc. No. 40 at 15). Lodestars are presumptively reasonable, *see City of Maywood*, 729 F.3d at 1202, and here, the requested award represents a substantial 51% discount from the estimated lodestar. However, the sum that plaintiffs' counsel requests represents approximately 53% of the $150,000.00 Gross Settlement Fund, more than double the 25% benchmark set by the Ninth Circuit under the percentage of the fund method. *See Vizcaino*, 290 F.3d at 1047. Notably, plaintiffs have not explicitly identified any special circumstances that would warrant such a large upward departure from the benchmark. (*See* Doc. No. 40 at 15.) Though the court may well grant an award of that size under certain circumstances, the court cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the method proffered by plaintiffs. Plaintiffs' failure here to fully justify its request for a departure from the benchmark effectively deprives the court of the ability to exercise informed discretion in choosing the method of determining a reasonable award of attorneys' fees. Given the substantial size of the requested award—at least in terms of the percentage of the Settlement—plaintiffs must provide additional and sufficient information to the court to allow it to conduct a proper cross-check of the requested fees.

      e. *Attorneys' Costs*

In addition, plaintiffs contend that they incurred $2,213.48 in "recoverable costs." (Doc. No. 15.) Although plaintiffs have provided billing records, expense reports, and copies of various receipts, they fail to explain to the court how they arrived at this particular number with respect to costs incurred. Their own case expense log lists $6,354.88 in expenses, and the court cannot

determine which of those expenses are being claimed as "recoverable." (*See* Doc. No. 40-1 at 42–43.) In order to be awarded costs, plaintiffs must submit a clearly organized expense log that specifically delineates the costs they wish to recover. *See, e.g.*, *City of Maywood*, 729 F.3d at 1204 n.4 (holding that a "district court could order the fee applicant to re-format and re-submit its billing records").

      f. *Paying the Settlement Claims Administrator*

The court also has questions about the fairness of requiring plaintiffs to pay half of the settlement administration costs, up a maximum of $5,000.00, even though that amount is represented to be part of the Settlement Fund. (Doc. Nos. 40 at 6; 40-1 at 16.) The headline value of the Settlement is $150,000.00, a sum that defendants are—at least in theory—paying. (Doc. Nos. 40 at 6, 12; 40-1 at 11, 13, 27.) Defendants, however, are effectively clawing back up to $5,000.00 by requiring plaintiffs to pay half of the settlement administration costs. Because this artificially inflates and to some extent misrepresents the value of the Settlement and is thus neither fair nor reasonable, the court will not approve this provision of the Settlement.

    3.    <u>Non-Monetary Terms</u>

      a. *Breadth of the Release of Claims*

In addition to the questionable monetary terms of the Settlement, the release of claims is impermissibly overbroad. The release of claims is as follows:

> In consideration of the total gross Settlement Amount as provided in the Agreement by Defendants and upon final approval of this Settlement by the Court, *the Plaintiffs release the Defendants from all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, whether in tort, contract, or for violation of any state or federal statute, rule or regulation arising out of, relating to, or in connection with any act or omission by or on the part of any of the Defendants*. Upon entry of the Court's Order approving the Settlement, Plaintiffs, all PAGA Settlement Group Members, and the State of California shall be deemed to have fully, finally, and forever waived, released, relinquished, and discharged Defendants and each and all of the Released Parties from any and all PAGA Claims as defined in the Settlement Agreement.

/////

16

(Doc. No. 40 at 9; *see also* Doc. No. 40-1 at 10–12, 18, 19) (emphasis added). Because this release includes claims that "have not been litigated, alleged, or valued" and which do "not reasonably track the allegations of the complaint," the court believes that it cannot approve the Settlement with this overbroad release included. *Gonzalez v. CoreCivic of Tennessee, LLC,* No. 1:16-cv-01891-DAD-JLT, 2018 WL 4388425, at *2 (E.D. Cal. Sept. 13, 2018) (listing cases).

        b. *Annual Certification of Compliance*

As part of the Settlement, defendant All Ag also committed to sending plaintiffs' counsel "an annual certification until January 1, 2022, due January 1st of each year, certifying it has paid overtime . . . [and] notified their new and existing employees of the Revised Overtime Policy." (Doc. Nos. 40 at 8; 40-1 at 16.) But because the court is denying preliminary approval of the Settlement, necessarily pushing back the implementation schedule under any settlement until late 2020 or even 2021, this provision will likely be of more limited duration than originally envisioned.[8] Thus, this provision should be amended to ensure that the certification period is effective for three calendar years following any final approval of a settlement.

## CONCLUSION

Evaluating the settlement as a whole, the court cannot grant preliminary approval at this time. Not only does the settlement contain internally inconsistent definitions, the court has serious concerns regarding: 1) the structure of the PAGA Settlement Fund; 2) the settlement of plaintiffs' individual FLSA claims; 3) who will pay the employer payroll taxes; 4) the requested attorneys' fees award; 5) the discrepancy in claimed costs; 6) the shifting of liability for the Settlement Claims Administrator; 7) the breadth of the release of claims; and 8) the duration of the annual certification process. Although the court is cognizant of the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Wise v. Ulta Salon*, No. 1:17-cv-00853-DAD-EPG, 2020 WL 1492672, at *4 (E.D. Cal. Mar. 27, 2020) (quoting *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)), the court cannot

---

[8] This is particularly so because of the ongoing judicial emergency and the court's extraordinarily heavy caseload, which could further delay preliminary and final approval of the Settlement. (*See* Doc. No. 49.)

17

approve the settlement as it has currently been presented.  However, the court will not forestall further efforts to settle this manner and strongly encourages the parties to resolve the issues identified by the court in this order and/or to otherwise address them in further application for preliminary approval.

Accordingly, the motion for preliminary approval of the settlement (Doc. No. 40) is denied without prejudice.

IT IS SO ORDERED.

Dated:   **April 17, 2020**                               _____
                                                          UNITED STATES DISTRICT JUDGE